Cook, J.,
concurring in judgment only. I concur with the majority’s outcome as to each of the three issues certified by the Sixth Circuit Court of Appeals. I write separately, however, because I disagree with the majority’s analysis of each of the issues.
I
Though the majority correctly resolves the first certified issue, I believe that its analysis misconstrues Ohio law by overlooking the standard set forth in Gearing v. Nationwide Ins. Co. (1996), 76 Ohio St.3d 34, 665 N.E.2d 1115.
A
The Sixth Circuit has asked us to determine under current Ohio law whether an insured’s bad-faith refusal to settle is the type of intentional tort that is excluded from insurance coverage under public policy. Rather than deciding this question under Gearing, this court’s most recent pronouncement on the issue, the majority returns to a standard set forth ten years ago in Harasyn v. Normandy Metals, Inc. (1990), 49 Ohio St.3d 173, 551 N.E.2d 962. Such an approach incorrectly states the law and summarily erases the strides taken in Gearing towards a more reasonable and appropriate analysis of the insurability of intentional torts.
My differences with the majority’s analysis can best be understood by examining three decisions reached by this court over the last decade. The first is Harasyn, where the court announced a distinction between “direct-intent” torts and “substantial-certainty” torts for purposes of insurance coverage. To arrive at the distinction, the court first acknowledged the fundamental public policy principle that intentional torts are' excluded from insurance coverage. Intentional torts, however, encompass “two different levels of intent.” Id. at 175, 551 N.E.2d at 964. The first level, referred to as direct intent, “is where the actor does something which brings about the exact result desired. In the second level, the actor does something that he believes is substantially certain to cause a particular result, even if the actor does not desire that result.” Id. Having clarified the two levels of intent, the Harasyn court concluded that public policy excludes from insurance coverage only direct-intent torts.
Consideration of the intentional-tort issue continued in Physicians Ins. Co. of Ohio v. Swanson (1991), 58 Ohio St.3d 189, 569 N.E.2d 906. There, the Swanson court concluded that an insured who fired at a group of people seventy feet away *289 causing severe injuries, but who testified that he did not mean to hurt anyone, did not have the level of necessary intent to exclude his actions from coverage. Thus, Swanson, for the most part, continued the Harasyn-type analysis, requiring evidence of direct intent to injure before an act would be excluded from coverage. In its conclusion, however, the Swanson court opened the door for its upcoming decision in Gearing: “In this case the exclusion is inapplicable because the trial court’s determination that Todd Baker’s injury was not intentionally inflicted or substantially certain to occur is supported by competent, credible evidence.” Id. at 193-194, 569 N.E.2d at 911. Unlike Harasyn, Swanson implied that substantial-certainty torts are excluded from insurance coverage. Because actual application of this substantial-certainty prong of the test was missing from Swanson, however, we were left to assume that the facts in that case did not reach the substantial-certainty level.
In our most recent case on this issue, Gearing v. Nationwide Ins. Co., supra, we more fully developed the substantial-certainty suggestion contained in Swanson. In Gearing, we expanded the intentional-tort exclusion beyond direct-intent torts, outlining a two-part analysis. The first part, as in Harasyn, requires subjective consideration of the tortfeasor’s direct intent. Where direct intent does not exist, however, the analysis proceeds to the second step, which considers objectively whether the tortfeasor’s intentional act was substantially certain to cause injury. In such instances “determination of an insured’s subjective intent, or lack of subjective intent, is not conclusive of the issue of coverage.” Id., 76 Ohio St.3d at 39, 665 N.E.2d at 1119. Rather, where substantial certainty exists, intent to harm will be inferred as a matter of law.
As the last case decided on this issue, Gearing represents current Ohio law. But instead of following Gearing, the majority resurrects the Harasyn view that direct-intent torts are excluded from coverage while substantial-certainty torts are not. Apparently recognizing that this approach alone is insufficient, however, the majority augments it with a nebulously defined category of acts. This category covers acts that are “intentionally injurious by definition” and for which no direct intent is needed. While the majority’s creation of this category is aimed at solving the shortcomings of the direct-intent approach, it produces instead an inherently ambiguous rule, as we are left to wonder precisely what this category contains. Indeed, the majority provides us with only two hints: (1) the category is very limited, and (2) it has been applied only to sexual molestation and murder.
The majority then assigns Gearing to this category of acts, relegating it to nothing more than an anomaly limited in application to the sexual-molestation scenario. While Gearing was decided in the sexual-molestation context, its application is certainly not so limited. First, the Gearing court itself applied the “substantial-certainty” analysis to a context other than sexual molestation, as it *290 discussed it in the context of the Swanson case. See id. at 39-40, 665 N.E.2d at 1119. Furthermore, one need only review the numerous post-Gearing appellate decisions to appreciate the precedential effect that courts have afforded that case. Ohio’s appellate courts have repeatedly and without hesitation followed Gearing as an effective means of analyzing coverage issues regarding intentional torts.
In Snell v. Katafias (Mar. 19, 1999), Montgomery App. No. 17440, unreported, 1999 WL 148229, for instance, the appellate court conducted a two-part analysis under Gearing of whether intentional infliction of emotional distress is excluded from insurance coverage. Determining first that the insured did not intend the injury, the court next asked whether the “injury resulting from an intentional infliction of emotional distress [was] objectively certain.” Id. Concluding that it was and that the claim was not covered, the court reasoned: “At some point where harm appears to have been objectively certain, we no longer ask whether the insured subjectively intended the resulting harm.” Id.
Also relying on Gearing, the court in Nationwide Mut. Ins. Co. v. Finkley (1996), 112 Ohio App.3d 712, 715, 679 N.E.2d 1189, 1191, concluded that “where an insured willfully and purposefully attempts to elude the police in an automobile chase through an urban area in reckless disregard of traffic control devices, his actions are substantially certain to result in injury.” Inferring intent to injure on that basis, the court reasoned that “[determining that an individual could obtain insurance coverage for damages caused by intentional criminal activity, by willful flight from the police, flies in the face of * * * established public policy.” Id. at 716, 679 N.E.2d at 1191. Accordingly, the court held that the wrongful act was excluded from insurance coverage.
The court in Allstate Ins. Co. v. Ray (Dec. 18, 1998), Mahoning App. No. 96CA20, unreported, 1998 WL 896366, also followed Gearing to conclude that a point-blank shooting was substantially certain to cause injury and therefore inferred intent to injure as a matter of law. Under the same reasoning, an insured’s act of punching another individual in the face, although purportedly done without intent to injure, was also substantially certain to injure and therefore excluded from coverage. Aguiar v. Tallman (Mar. 15, 1999), Mahoning App. No. 97 C.A. 116, unreported, 1999 WL 148367. Similarly, intent to injure was inferred under Gearing to the act of chopping down a neighbor’s trees, since that act was considered substantially certain to cause harm. Cogar v. Commercial Union Ins. Co. (Feb. 9, 1999), Medina App. No. 2816-M, unreported, 1999 WL 74620.
Not only is Gearing the current state of the law in Ohio, but because it embodies an objective analysis, it also constitutes the better-reasoned approach. In fact, a significant number of jurisdictions across the country impose similar objective tests, rejecting the inadequacies of the subjective analysis. See, e.g., *291 Am. Bankers Ins. Co. of Florida v. Gilberts (C.A.8, 1999), 181 F.3d 931, 932; CNA Ins. Co. v. McGinnis (1984), 282 Ark. 90, 666 S.W.2d 689; Wright v. White Birch Park, Inc. (1982), 118 Mich.App. 639, 325 N.W.2d 524. See, also, Annotation (1984), 31 A.L.R.4th 957. A Missouri appeals court, for instance, explained the superiority of the objective test in the following manner:
“Supplanting an objective standard with a subjective standard for determining whether the act or conduct of an insured is ‘intentional’ or ‘expected or intended’ for purposes of assessing coverage would emasculate apposite policy provisions by making it impossible to preclude coverage for intentional acts or conduct absent admissions by insureds of a specific intent to harm or injure. Human nature augers against any viable expectation of such admissions.” Truck Ins. Exchange v. Pickering (1982), 642 S.W.2d 113, 116.
The inadequacy of a subjective standard such as the majority’s becomes particularly clear when viewed in a Swanson-type context. In Swanson, the tortfeasor’s act of shooting towards a group of bystanders was not excluded from coverage because he lacked intent to injure. While this result may be palatable where the insured shot from a distance of seventy feet, had the insured fired from only ten or even five feet away, causing the same injuries and also claiming the same lack of intent, certainly a different result should follow due to the foreseeability of the injury. But under the majority’s approach, that shooting would not be excluded from coverage because the lack of direct intent to injure is all that precludes coverage. Nor would the shooting likely fall into the majority’s “intentionally injurious by definition” category, as it involves neither murder nor sexual molestation.
As we set forth in Gearing, “[liability insurance does not exist to relieve wrongdoers of liability for intentional, antisocial, criminal conduct.” 76 Ohio St.3d at 38, 665 N.E.2d at 1118. Rather, insurance policies are purchased “ ‘as protection against calamity.’ ” Transamerica Ins. Group v. Meere (1984), 143 Ariz. 351, 355, 694 P.2d 181, 185, quoting Noble v. Natl. Am. Life Ins. Co. (1981), 128 Ariz. 188, 189, 624 P.2d 866, 867. Thus, “[t]he intentional exclusion is necessary to the insurer to enable it to set rates and supply coverage only if losses under policies are uncertain from the standpoint of any single policyholder, and if a single insured is allowed through intentional or reckless acts to consciously control risks covered by policy, the central concept of insurance is violated.” 7A Appleman, Insurance Law and Practice (Rev.1979) 21, Section 4492.01. By permitting coverage of intentional acts that are substantially certain to occur, the majority places contrpl of such risks squarely into the tortfeasor’s hands.
In sum, then, this court ought not to depart from Gearing, as the departure does nothing to clarify the analysis of this issue. Rather, it imposes an *292 inadequate subjective test, coupled with an undefined category of inferred intent acts. More importantly, the majority’s standard violates public policy by allowing coverage for wrongful acts that are substantially certain to cause injury.
B
Though I disagree with the standard used by the majority to decide the first certified question, I do concur with the resolution it reaches. The majority correctly concludes that direct intent does not necessarily exist where a jury’s verdict of bad-faith refusal to settle with actual malice is based upon the interrogatories and instructions involved here. While a jury’s finding of actual malice may signal the existence of direct intent in various instances, when a jury’s instructions imply that actual malice may be found on grounds other than intent, the jury’s verdict does not necessarily include a finding of direct intent.
Under Gearing, however, the analysis should not end there. Rather, we must ask whether as a matter of law we are to infer intent to injure from such a verdict. Both the bad-faith verdict and the actual-malice findings returned against Buckeye in Leber II concern Buckeye’s subjective intent. Such intent, however, is irrelevant to the Gearing substantial-certainty determination. What is relevant is whether Buckeye’s refusal to settle was substantially certain to injure the Lebers. Buckeye claimed that it had no duty to the Lebers because they were not insureds under the contract. Although reversed by this court, the appellate court agreed with Buckeye in Leber II and concluded that the Lebers were not covered under the policy and therefore had no claim against Buckeye. Because contracts are inherently subject to differing interpretations, I believe that a verdict of bad-faith refusal to settle with actual malice does not rise to the level of substantial certainty to injure under these circumstances.
I would conclude, therefore, that a jury’s verdict of bad-faith refusal to settle with actual malice does not evidence the type of intentional tort that is excluded from insurance coverage where the jury instructions and interrogatories do not clarify the requirement of intent to injure (Harasyn). Furthermore, such a verdict does not satisfy the objective portion of the intentional-tort inquiry, as the act of bad-faith refusal to settle is not necessarily, as a matter of law, substantially certain to injure (Gearing).
II
I agree with the majority’s conclusion that Buckeye is not collaterally estopped from litigating the issue of direct intent. Based upon the above rationale, however, I would also include within that analysis the issue of substantial certainty to injure. I do, however, disagree with the majority’s discussion of the third prong of the Goodson collateral-estoppel test.
*293 In order to assert collateral estoppel, a party must prove that the identical issue was (1) actually litigated, (2) directly determined, and (3) essential to the judgment handed down in the prior action. Goodson v. McDonough Power Equip., Inc. (1983), 2 Ohio St.3d 193, 201, 2 OBR 732, 739, 443 N.E.2d 978, 985. The majority begins its analysis with the second prong of this test, and correctly decides that the issues here were not “directly determined.” In so concluding, the majority emphasizes that the issues to be litigated here are not whether Buckeye acted in bad faith with actual malice. Rather, the relevant issue is whether Buckeye acted with direct intent (and I would include substantial certainty) to injure. Because these exact issues were not “directly determined,” the Goodson standard is not met and Buckeye is not collaterally estopped from litigating these issues.
Because one of the prongs has not been met, the analysis should end here. The majority, however, continues its consideration of the Goodson test, concluding that the third prong of Goodson was also not satisfied. In analyzing the third prong, however, the majority appears to confuse the relevant issues. While the majority correctly emphasizes in'its analysis of the second prong that the issues to be litigated are not bad faith with actual malice but instead direct intent, when analyzing the third prong it focuses upon actual malice as the issue to be litigated. Specifically, the majority concludes that the actual-malice finding was not essential to the judgment handed down in the prior action. Actual malice should play no part, however, in the analysis. Although this third prong does not need to be addressed, if it is, the question to be asked is whether the issues of direct intent and substantial certainty were essential to the judgment handed down in the prior action.
Nonetheless, the majority reaches the correct resolution. Based upon that conclusion, I would hold that the issues of direct intent and substantial certainty to injure have not been directly determined in the prior action and therefore Buckeye is not collaterally estopped from litigating its case.
111
While I agree with the majority’s response to the third certified question, I believe that elaboration on the rationale supporting this determination would be of use. As the majority concluded, the issue of whether New England’s policy excludes Buckeye’s act of refusing to settle is an issue more appropriate for the trial court. This conclusion is proper because the verdict returned here is not, as a matter of law, the equivalent of the exclusion contained in the policy.
The relevant exclusion in the New England policy provides:
*294 “(a) This Insurance shall not cover any Insured whose personal dishonesty, fraudulent breach of trust, or intention to deceive or defraud has been finally adjudicated or may be established.”
Neither the jury’s verdict nor the accompanying interrogatories and instructions contained the language used in the exclusion. New England contends that the items contained in the exclusion and the jury’s findings are essentially equivalent and therefore the claim should be excluded. Exclusion (a), however, is ambiguous as to whether it excludes a claim for bad-faith refusal to settle with actual malice. The language of the exclusion does not mirror the elements of bad faith or actual malice, nor does it at any point mention them by name.
It is axiomatic that where language in an insurance policy is susceptible of more than one meaning, the court will construe it liberally in favor of the insured and strictly as against the insurer. Buckeye Union Ins. Co. v. Price (1974), 39 Ohio St.2d 95, 99, 68 O.O.2d 56, 58, 313 N.E.2d 844, 846. Accordingly, if it was New England’s intent to exclude bad-faith refusal to settle either with or without malice from its professional liability policy, it certainly could have used specific language to create such an exclusion.[1] Construing the ambiguous exclusion language against New England, then, I believe that the exclusion neither corresponds to the elements of bad-faith refusal to settle or to actual malice, nor does it specifically set forth such exclusions. Provision (a), therefore, does not, as a matter of law, exclude from coverage a claim based upon a judgment of bad-faith refusal to settle with actual malice.
Lundberg Stratton, J., concurs in the foregoing opinion.

. In fact, Buckeye’s merit brief suggests that New England marketed the policy as specifically covering bad-faith claims. Furthermore, the policy explicitly covers punitive damages.